IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

ROBERT ELLIS NILON,

                                                                                           INDEX NO.
                                                                                         ECF CASE

                                   PLAINTIFF,

                 vs.

THE CITY OF NEW YORK, a municipal entity,                     COMPLAINT
NEW YORK CITY POLICE OFFICER JUAN                       [JURY TRIAL
BURGOS, NEW YORK CITY POLICE                            DEMANDED]
INSPECTOR TIMOTHY BEAUDETTE,
NEW YORK CITY POLICE OFFICERS
"JOHN DOES 1-10,"

                                 DEFENDANTS.

_____

      Plaintiff ROBERT ELLIS NILON, by his attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully allege as follows:

## I. PRELIMINARY STATEMENT

   1.    Plaintiff ROBERT ELLIS NILON bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

   2.    In the evening of July 14, 2013, Plaintiff ROBERT ELLIS NILON was present near the intersection of 79th Street and 2nd Avenue in New York, NY. While present at the aforesaid intersection, Plaintiff ROBERT ELLIS NILON was lawfully present in a crosswalk with the traffic lights and crossing signals in his favor. Prior to the interaction at issue here, Plaintiff ROBERT ELLIS NILON had been participating in a march in protest against the acquittal of George Zimmerman on murder charges in the death of Trayvon Martin.  On information and belief, several thousand individuals participated in the protest march at issue here.

   3.    As Plaintiff ROBERT ELLIS NILON was in the process of crossing the street and nearly completed crossing the street, Defendant NEW YORK CITY POLICE INSPECTOR TIMOTHY BEAUDETTE ("Defendant INSPECTOR BEAUDETTE") singled out and seized Plaintiff ROBERT ELLIS NILON, and took him to the ground, causing Plaintiff to suffer pain, abrasions and bruising. Multiple Defendant "John Doe" POLICE OFFICERS and Defendant NEW YORK CITY POLICE OFFICER JUAN BURGOS ("Defendant OFFICER BURGOS") then assisted Defendant INSPECTOR BEAUDETTE in arresting Plaintiff ROBERT ELLIS NILON.

4.      Defendant OFFICER BURGOS then swore out a criminal complaint against Plaintiff ROBERT ELLIS NILON that falsely alleged two counts of Disorderly Conduct, based on the false allegations that Plaintiff ROBERT ELLIS NILON refused orders issued by Defendant INSPECTOR BEAUDETTE and was somehow blocking traffic while lawfully crossing the street at a crosswalk with lights in his favor.  Plaintiff ROBERT ELLIS NILON returned to court on six occasions before all charges against him were dismissed in their entirety, due to his arresting officer's repeated failure to appear in support of the false charges tendered against Plaintiff.

5.      In sum, Plaintiff ROBERT ELLIS NILON brings this claim as a quest for answers as to why —— despite the fact that he was at all times compliant with the law —— New York City Police Officers sworn to serve and protect him instead harassed him, brutalized him, and caused him to suffer injuries seemingly due solely to his exercise of his First Amendment rights to free speech and participation in peaceful assembly.

## II. JURISDICTION

6.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

7.      Plaintiff ROBERT ELLIS NILON further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

8.      Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV. JURY DEMAND

9.      Plaintiff ROBERT ELLIS NILON respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

10.   Plaintiff ROBERT ELLIS NILON is a resident of the City, County and State of New York.

11.   Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

12.   Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

13.   That at all times hereinafter mentioned, Defendant INSPECTOR BEAUDETTE, Defendant OFFICER BURGOS, and the Defendant POLICE OFFICERS "JOHN DOES 1-10" (Collectively, "Defendant POLICE OFFICERS") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

14.   Plaintiff ROBERT ELLIS NILON will amend this complaint to name the Defendant "John Doe" POLICE OFFICERS as their identities can be established to a reasonable certainty.

15.   That at all times relevant to this action, the Defendant POLICE OFFICERS either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

16.   Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope of their employment by Defendant CITY OF NEW YORK.

17.   Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by Defendant CITY OF NEW YORK.


## VI. FACTS COMMON TO ALL CLAIMS

18.   On the evening of July 14, 2013, at or around 10:45 pm, Plaintiff ROBERT ELLIS NILON was present near the intersection of 2nd Avenue and 79th Street.

19.   Plaintiff ROBERT ELLIS NILON was present at that location participating in a march protesting the acquittal of George Zimmerman on murder charges stemming from the shooting death of Trayvon Martin.

20.   At or around the same time as the events detailed herein, an unidentified police officer, described as being bored, told journalist Christopher Robbins of Gothamist that the protest detail in question amounted to "[a] dollar a minute, that's how I see it. Pension.[1]"  On information and belief, this contemporaneous quotation indicates that no particular crisis or emergency was occurring at the time of the incident described herein.

21.   Plaintiff ROBERT ELLIS NILON had been participating in the protest march for several hours before the events giving rise to the incident in question began.

22.   Over this same period of time, Plaintiff ROBERT ELLIS NILON observed multiple instances of various police officers pushing, grabbing, shoving and otherwise manhandling march participants without apparent cause or justification.

23.   At or around 10:45 pm, Plaintiff ROBERT ELLIS NILON began crossing 2nd Avenue at 79th Street.

---

[1]  See https://twitter.com/ChristRobbins/statuses/356606905411567616

24.   Plaintiff ROBERT ELLIS NILON began crossing 2nd Avenue at a time when the traffic light for 79th Street traffic was green; hence, the crosswalk signal indicated "Walk" at the time that Plaintiff ROBERT ELLIS NILON was crossing 2nd Avenue.

25.   Plaintiff ROBERT ELLIS NILON was legally crossing 2nd Avenue with signals in his favor.

26.   Shortly before Plaintiff ROBERT ELLIS NILON reached the opposing sidewalk of 2nd Avenue, Defendant INSPECTOR BEAUDETTE and several other Defendant POLICE OFFICERS seized Plaintiff ROBERT ELLIS NILON and took him to the ground.

27.   The Defendant POLICE OFFICERS who tackled Plaintiff ROBERT ELLIS NILON did not provide Plaintiff ROBERT ELLIS NILON with any type of warning or order before tackling him to the ground.

28.   None of the Defendant POLICE OFFICERS present provided Plaintiff ROBERT ELLIS NILON with any type of warning or order before Defendant INSPECTOR BEAUDETTE took Plaintiff ROBERT ELLIS NILON to the ground.

29.   At or around this time, Defendant INSPECTOR BEAUDETTE  and/or one more of the Defendant POLICE OFFICERS pinned Plaintiff ROBERT ELLIS NILON to the ground.

30.   Plaintiff ROBERT ELLIS NILON had not resisted and was not resisting the Defendant POLICE OFFICERS' attack.

31.   On information and belief, the Defendant POLICE OFFICERS applied force against Plaintiff ROBERT ELLIS NILON because of his participation in First Amendment protected activity, to wit, the aforesaid protest march.

32.   On information and belief, Defendant INSPECTOR BEAUDETTE procured the arrest of Plaintiff ROBERT ELLIS NILON because of his participation in First Amendment protected activity, to wit, the aforesaid protest march.

33.   On information and belief, Defendant INSPECTOR BEAUDETTE used force against Plaintiff ROBERT ELLIS NILON and arrested Plaintiff ROBERT ELLIS NILON both to end Plaintiff ROBERT ELLIS NILON's participation in the aforesaid protest march, and to deter and chill the other participants in the aforesaid protest march, in violation of the First Amendment rights of Plaintiff.

34.   Defendant INSPECTOR BEAUDETTE had no legitimate or cognizable reason for pinning Plaintiff ROBERT ELLIS NILON to the ground as he was crossing the street at a crosswalk with the lights in his favor.

35.   At no point before, during, or after the Defendant POLICE OFFICERS' attack of Plaintiff ROBERT ELLIS NILON did any of the other Defendant POLICE OFFICERS attempt to stop, obstruct, or otherwise prevent Defendant INSPECTOR BEAUDETTE from doing same.

36.   Defendant INSPECTOR BEAUDETTE then twisted Plaintiff ROBERT ELLIS NILON' arms behind Plaintiff's back thereby causing significant and severe pain to both the hands and arms of Plaintiff ROBERT ELLIS NILON.

37.   Upon information and belief, shortly thereafter, Defendant INSPECTOR BEAUDETTE knowingly and willfully directed Defendant OFFICER BURGOS to prepare a criminal complaint falsely alleging that Plaintiff ROBERT ELLIS NILON had violated PL 240.20(5), Disorderly Conduct by obstructing vehicular or pedestrian traffic, and PL 240.20(6), Disorderly Conduct by refusing to comply with a lawful order to disperse.

38.   Plaintiff ROBERT ELLIS NILON did no such thing of his own volition; he had been crossing the street at a crosswalk with signals in his favor.  Any obstruction of vehicular or pedestrian traffic could only have accrued as a result of the conduct of the Defendant POLICE OFFICERS, and not Plaintiff ROBERT ELLIS NILON.

39.   Further, Plaintiff ROBERT ELLIS NILON could not have been subject to a lawful order to disperse while crossing the street at a crosswalk with signals in his favor.

40.   Shortly thereafter, one or more of the Defendant POLICE OFFICERS placed Plaintiff ROBERT ELLIS NILON in a nearby police vehicle.

41.   The Defendant POLICE OFFICERS then transported Plaintiff ROBERT ELLIS NILON to multiple police precincts before processing his arrest, thereby delaying his processing and arraignment.

42.   Plaintiff ROBERT ELLIS NILON was detained for approximately 24 hours before being released on his own recognizance following arraignment.

43.   The Defendants charged Plaintiff ROBERT ELLIS NILON with two (2) counts of Disorderly Conduct - PL 240.20(5) and PL 240.20(6).

44.   Plaintiff ROBERT ELLIS NILON' appeared before the Court on a total of six occasions following his July 14, 2013 arrest by the Defendant POLICE OFFICERS.

45.   After repeatedly stating that he was ready for trial, the charges against Plaintiff ROBERT ELLIS NILON were dismissed on speedy trial grounds after the Defendant POLICE OFFICERS repeatedly failed to appear to testify in support of the prosecution they had procured against Plaintiff.

46.   As a result of the foregoing, Plaintiff ROBERT ELLIS NILON sustained, *inter alia,* physical injuries, mental injuries, emotional distress, embarrassment, humiliation, and deprivation of his constitutional rights.

47.   As a result of the Defendants' constitutionally violative conduct, Plaintiff ROBERT ELLIS NILON demands a judgment from Defendants in a sum of money to be determined at trial.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

48.   Plaintiff ROBERT ELLIS NILON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

49.   All of the aforementioned acts of the Defendant POLICE OFFICERS, their agents, servants and employees, were carried out under the color of state law.

50.   All of the aforementioned acts deprived Plaintiff ROBERT ELLIS NILON of the rights, privileges and immunities guaranteed to citizens of the United States by the First, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

51.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

52.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

53.   The individual Defendants and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

54.   As a result of the foregoing, Plaintiff ROBERT ELLIS NILON was put in fear for his safety; harassed, battered, berated, and caused to suffer a significant and painful injury to his wrists and hands.

55.   As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

56.   As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**FALSE ARREST UNDER 42 U.S.C. § 1983**

57.   Plaintiff ROBERT ELLIS NILON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

58.   As a result of the aforesaid conduct by Defendants, Plaintiff ROBERT ELLIS NILON was subjected to an illegal, improper and false arrest by the Defendants and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

59.   As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT ELLIS NILON was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

60.   As a result of Defendants' impermissible conduct, Plaintiff ROBERT ELLIS NILON demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER 42 U.S.C. 1983

61.   Plaintiff ROBERT ELLIS NILON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

62.   The Defendants caused a criminal proceeding to be brought against Plaintiff ROBERT ELLIS NILON after unlawfully arresting him on July 14, 2013.

63.   Defendants procured this criminal proceeding through the knowing and willful presentation of false allegations regarding the conduct of Plaintiff ROBERT ELLIS NILON to the office of the New York County District Attorney.

64.   The criminal proceeding procured by Defendants against Plaintiff ROBERT ELLIS NILON was terminated in his favor, with a full dismissal of all charges against him.

65.   The Defendants lacked probable cause to initiate a criminal proceeding against Plaintiff ROBERT ELLIS NILON.

66.   The Defendants acted with malice in initiating a criminal proceeding against Plaintiff ROBERT ELLIS NILON.

67.   Plaintiff ROBERT ELLIS NILON was forced to appear in court on six (6) occasions to answer the criminal proceeding that Defendants maliciously caused to be brought against him.

68.   As a result of the aforementioned conduct of the individual Defendants, Plaintiff ROBERT ELLIS NILON' constitutional rights were violated.

69.   As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT ELLIS NILON was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

70.    As a result of Defendants' impermissible conduct, Plaintiff ROBERT ELLIS NILON demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

71.    Plaintiff ROBERT ELLIS NILON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

72.    The Defendants had an affirmative duty to intervene on Plaintiff ROBERT ELLIS NILON' behalf to prevent the violation of his constitutional rights.

73.    The individual Defendants failed to intervene on Plaintiff ROBERT ELLIS NILON' behalf to prevent the violation of his constitutional rights despite having had a realistic opportunity to do so.

74.    The individual Defendants failed to intervene on Plaintiff ROBERT ELLIS NILON 's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff ROBERT ELLIS NILON' rights were violated by their affirmative conduct.

75.    As a result of the aforementioned conduct of the individual Defendants, Plaintiff ROBERT ELLIS NILON' constitutional rights were violated.

76.    As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT ELLIS NILON was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

77.    As a result of Defendants' impermissible conduct, Plaintiff ROBERT ELLIS NILON demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

78.    Plaintiff ROBERT ELLIS NILON repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

79.    Defendant INSPECTOR BEAUDETTE used excessive force in taking Plaintiff ROBERT ELLIS NILON to the ground.

80.    Defendant POLICE OFFICERS used excessive force against Plaintiff ROBERT ELLIS NILON in the course of his arrest, causing him to sustain bruises and abrasions and to suffer significant pain and injury.

81.   Defendant POLICE OFFICERS used excessive force in handcuffing Plaintiff ROBERT ELLIS NILON in the absence of probable cause for his arrest.

82.   At no point during the above-mentioned actions did the circumstances presented to the Defendants support any of the above-mentioned applications of force on Plaintiff ROBERT ELLIS NILON.

83.   Plaintiff ROBERT ELLIS NILON was subjected to excessive force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

84.   As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT ELLIS NILON was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

85.   As a result of Defendants' impermissible conduct, Plaintiff ROBERT ELLIS NILON demands judgment against Defendants in a sum of money to be determined at trial.


## SIXTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM
## UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. § 1983

86.   Plaintiff ROBERT ELLIS NILON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

87.   Defendants harassed, battered, and caused Plaintiff ROBERT ELLIS NILON to be prosecuted in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that their conduct would jeopardize Plaintiffs' liberty, well-being, safety and constitutional rights.

88.   The acts complained of were carried out by the aforementioned individual defendant Police Officers in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

89.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

90.   The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

a) wrongfully arresting individuals without probable cause due to perceived lack of

respect for the police officer (i.e., "contempt of cop" arrests);

b) wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "contempt of cop" "cover charge" arrests); and

c) wrongfully arresting individuals in order to terminate their participation in First Amendment protected peaceful protest activities, and chill individuals and groups from participating in such activities generally in New York.

91.   Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons engaged in the practice of exercising their First Amendment Protected rights to free speech and association.

92.   Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against person specifically engaged in the practice of exercising their First Amendment Protected rights to free speech and association while participating in or observing assemblies, marches, and events in New York.

93.   Many instances of this practice or custom were documented recently in the course of the Occupy Wall Street protests.

94.   In January 2012, the concentrated and collaborative efforts of seven law school clinics throughout the United States founded the *Protests and Assembly Rights Project* in order to "Investigate… the United States' response to Occupy Wall Street in light of the government's international legal obligations."[2]

95.   These same concentrated and collaborative efforts helped the *Protests and Assembly Rights Project* draft and thereafter, in July of 2012, publish, "Suppressing Protest: Human Rights Violations In The U.S. Response To Occupy Wall Street" ("The Report"); wherein, the authors state, "In many instances, the… [NYPD] have responded aggressively to nonviolent protests, and have escalated situations —— through arbitrary or misapplications of the law, an excessive police presence, or the use of unwarranted force. The police response has thus . . . undermined basic assembly and expression freedoms [and] [a]t times . . . presented a threat to the safety of New Yorkers." See fn4 at [internal pagination] 71.

96.   In efforts to explain and/or identify the source of the NYPD's "aggressive responses to nonviolent protests", The Report calls attention to the fact that, "in recent years, New York City has witnessed a shift from 'reactive' policing to 'proactive' policing under Commissioner Raymond Kelly's 'Safe Streets, Safe City' initiative…. [meaning] that police adopt measures in advance to minimize the potential impact and size of a protest, which might include preparing a large police force to arrive at a scheduled protest location before the event begins, or regulating permits for the protest in

---

[2] Sarah Knuckley et al., "Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street" (2012). Report incorporated by reference herein and available online at: http://chrgj.org/documents/suppressing-protest-human-rights-violations-in-the-u-s-response-to-occupy-wall-street/

a manner designed to redirect the protest." <u>See</u> fn1 at [internal pagination] 30 (internal citations omitted).

97.     Despite the positive implications in the title of Commissioner Kelly's 'Safe Streets, Safe City' initiative, this 'proactive' form of policing has failed to keep protesters, observers, and bystanders alike safer, but instead, has led to repeated and continuing acts of police officers committing "clear violations of the government's obligation to uphold assembly and expression rights.... [amounting together to] protest suppression[.]" <u>See</u> fn2 at [internal pagination] 71.

98.     Further, The Report cites several instances of "Overpolicing and Poor Communication" conducted by the NYPD, where generally "[a]t times, the number of officers on hand [at OWS assemblies, marches, and events] has rivaled or even exceeded the number of protestors . . . repeatedly, the number of visible police [has been] manifestly excessive in comparison to both the peaceful nature of the assembly and the number in attendance at the protests." to wit; "[o]casionally, officers in visibly threatening "hard" uniform (e.g.. body padding, helmets, shields) have attended protests, including small protests posing no evident threat." <u>See</u> fn2 at 82.

99.     Witnesses have observed NYPD officers who have been assigned to perform crowd control duties and overall help provide for individuals' safety instead strike, beat, and otherwise berate civilians without reason, without notice, and without consequence; to wit, "One protester . . . reported being punched in the left temple by an officer, without any apparent provocation or notice [and thereafter] [t]he punch led to swelling, bleeding, bruising, dizzy spells, and nausea [which required] the individual [to seek] emergency medical treatment[,]" further, "[one legal observer who was also a retired New York Supreme Court judge] . . . witnessed an officer throw a woman to the ground 'out of nowhere' and hit her in the head[,]" and still further, "[one video from an OWS event] shows that an officer approached a woman from behind and grabbed her by the strap of her backpack and her scarf for no apparent reason[;] the officer [then] began to pull the woman towards him . . . for approximately fifteen seconds, and appeared to possibly be choking her via the strap of her scarf [and after this incident] the police appeared not to take any action [against the officer]." <u>See</u> fn2 at 73, 74, and "Appendix I[:] Table of Alleged Police Use of Force Incidents."

100.   The Report posits how, following incidents of police brutality such as these, the conduct of the NYPD in response to OWS assemblies, marches, and events has and continues to cause "[p]rotestors [to] reasonably perceive that they cannot safely protest [and thus remain] constantly on guard for potential arbitrary police force, or decide to leave the assembly[,]"; and as a result OWS participants, observers, and bystanders and civilians generally "view a[n] NYPD officer as someone who can take out [his] baton and beat [an individual] and face no repercussion." <u>See</u> fn2 at 81.

101.   Or further, stated differently by a graduate student who had attended multiple OWS events before and leading up to The Report's publication, "'It's a shock when you expect police to protect you, but you see them beat people . . . [I] grew up thinking that the cops are 'the good guys' but . . . when you see them beat people for no reason, it changes your world. You don't feel safe." <u>See</u> fn2 at 82.

102. Plaintiff ROBERT ELLIS NILON did not feel safe on the evening of the July 14th, 2013.

103. In suggesting positive changes that the NYPD should employ to effectively curb and prevent its officers from engaging in repeated, continuing and widespread acts of excessive force in response to OWS assemblies, marches, and events specifically and individuals' exercising of their First Amendment protected rights generally, The Report states, "[Government agencies] have an international legal obligation to investigate, prosecute, and remedy human rights violations[;] [t]his obligation requires [government agencies] to have in place systems that enable individuals to have 'accessible and effective remedies' to vindicate their rights . . . [t]he obligation to investigate and punish violations 'requires that not only the direct perpetrators of human rights violations be punished.'" See fn2 at 68.

104. Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force in order to effectively chill the First Amendment protected expression of participants, observers, and bystanders to protest actions, but has failed to take action to remedy the problem.

105. Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality utilized in order to effectively chill civilians' exercise of their First Amendment protected rights, instead choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

106. Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the continuation of the practice and custom of NYPD officers' use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

107. Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the continuation of the practice and custom of NYPD officers' use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

108. Defendant CITY OF NEW YORK's knowledge and condonation of the continuing customs and practices that caused Plaintiff's injury precede the relatively recent Occupy movement protests, and have been repeated and clear for twenty (20) years.

109. On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of

NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report").[3]

110.  The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS."  The Report at page before "i."

111.  The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant City of New York, and therefore knowledge of its contents may be imputed to Defendant City of New York.

112.  The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence."

113.  The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

114.  One police officer who testified before the Mollen Commission explained that the code of silence "…starts in the Police Academy, and it just develops from there…. It starts with the instructors telling you never to be a rat, never give up your fellow officer.  It starts with other recruits telling you they'll never give you up, and it just goes down the line as you go… into a precinct."  The Report at 55.

115.  Another officer who testified before the Mollen Commission stated that "[c]ops don't tell on cops.  And if they did tell on them, just say if a cop decided to tell on me, his career's ruined.  He's going to be labeled as a rat…. he's going to have nobody to work with.  And chances are if it comes down to it… [the whistleblower's fellow officers are] going to let him get hurt." The Report at 53-54.

116.  A third officer who testified before the Mollen Commission concurred, stating: "[i]f you're labeled a rat… you're going to have a difficult time for the remainder of your career…. [i]t was something that you couldn't shake." Id. at 54.

117.  An NYPD lieutenant who testified before the Mollen Commission confirmed that officers are at times "ostracized" for breaking the code of silence. Id.

118.  An NYPD captain who disciplined his subordinates for misconduct and reported allegations of corruption to NYPD Internal Affairs explained to the Mollen Commission that he had been transferred to thirty-eight (38) different commands in the course of his

---

[3] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York.  Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf .

career, and in almost every case "he found evidence that his reputation had preceded him.  At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm." Id.

119.  The Mollen Commission Report explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

120.  The Mollen Commission went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

121.  The Mollen Commission found that "[police b]rutality is… used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

122.  One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance.  It's not simply giving a beating.  It's the other officers begin [sic] to accept you more." Id.

123.  The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence…. [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the… [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse."  The Report at 49.

124.  As of the July 7, 1994 Mollen Commission Report, Defendant City of New York had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of themselves and their fellow officers, including brutal conduct like that which was perpetrated by Defendant POLICE OFFICERS upon Plaintiff.

125.  On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

126.  On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

127.  The failure of Defendant CITY OF NEW YORK to meaningfully address these issues was underscored when the non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los

Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[4]

128.  Research for this report was conducted over two and a half years, from late 1995 through early 1998.  See fn3.

129.  The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small minority who taint entire police departments but are protected, routinely, by the silence of their fellow officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to those incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." See Id.

130.  The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. See Id.

131.  The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. See Id.

132.  Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

133.  Upon information and belief, the Mayor denounced the report without reading it.

134.  Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

135.  Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

---

[4] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.  Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspohtml/toc.htm.

136.  That the Defendant City of New York continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

a.  **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers…. [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

b.  **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996)  ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

c.  **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

d.  **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence…. Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."

e.  **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful…. [a]s a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

137.  Upon information and belief, the above-referred constitutionally violative policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

138.  Upon information and belief, the policymakers of the NYPD and Defendant City of New York are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

139.  Defendant City of New York has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

140.  In the introduction to the Mollen Commission Report, it is noted that "the [Internal Affairs] system designed to protect the [New York City Police] Department from corruption minimized the likelihood of uncovering it." The Report at 3.

141.  The Mollen Commission Report explained that at that time, the Internal Affairs Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to close cases with as little effort as possible…. One officer told us they sit around and 'eat donuts and do crossword puzzles' -- and the supervisors and commanders did little more…. an anonymous survey of the work conditions and attitudes of IAD investigators… revealed that almost half of IAD investigators' time was spent on non-investigatory matters  --  and more of their 'investigative' work was done without ever leaving their office…. The facts confirmed IAD's do-nothing reputation." The Report at 85

142.  Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in 1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available.  *NYPD Internal Affairs 2006 Annual Report*, 12-13.[5]

143.  Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id*.

144.  More information relating to these customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department is available in "THE PRICE OF BRUTALITY: A special report.; Police Complaints Settled, Rarely Resolved." *The New York Times*, September 17, 1997.[6]

_____

[5] 1993-2006 Internal Affairs Reports available online at
http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.

[6] Sontag, Deborah & Barry, Dan, *The New York Times*, Sept. 17, 1997 available online at
http://www.nytimes.com/1997/09/17/nyregion/price-brutality-special-report-police-complaints-settled-rarely-resolved.html?pagewanted=all&src=pm.

145.  Upon information and belief, the steady decline in investigations by NYPD Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

146.  Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

147.  Upon information and belief, Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

148.  Defendant City of New York has also had notice that the New York City Civilian Complaint Review Board ("CCRB") has not been effective in curbing the above-referred practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

149.  This is not a new phenomenon; in Sango v. New York, 1989 U.S. Dist. LEXIS 18214, 40-41 (S.D.N.Y. June 19, 1989), the court found that CCRB investigations into police misconduct were so grossly inadequate that "their predictable results could have led… officers to believe that their conduct, no matter how improper, would go unpunished."

150.  In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

151.  In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the Defendant City of New York knew or should have known that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

152.  The policy of failure to screen, discipline, supervise, counsel, transfer, control, and correct unconstitutional patterns or conditions, is evidenced, *inter alia*, by the cases and reports cited above.

153.  Upon information and belief, Defendant, CITY OF NEW YORK, and the New York City Police Department failed to effectively screen, train, supervise and discipline its police officers, including, but not limited to, Defendant "John Doe" POLICE OFFICERS, as demonstrated by their propensity for group violence, including excessive use of force and restraint, and for their failure to protect citizens from unconstitutional conduct of other police officers.

154.  Upon information and belief, Defendant CITY OF NEW YORK, failed to put into place and otherwise maintained an inadequate structure for risk containment and stress management relative to its police officers.  *Inter alia*, the structure was deficient at the time of pre-selection and selection to evaluation and exchange within the command structure about the performance of individual police officers; to the training of supervisory personnel to effectively and adequately evaluate performance of an officer; and to otherwise put the command structure on notice that an individual was at significant levels of risk to the public at large or to specific segments thereof.

155.  The net effect of these deficiencies and failures was to permit police officers of the New York City Police Department to function at levels of significant and substantial risk to the public.

156.  Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality, choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

157.  Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

158.  Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

159.  As a result of the aforementioned conduct of the Defendant CITY OF NEW YORK and the individual Defendant Police Officers, Plaintiff ROBERT ELLIS NILON's constitutional rights were violated.

160.  As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT ELLIS NILON was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

161.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION
## UNDER 42 U.S.C. § 1983

162.  Plaintiff ROBERT ELLIS NILON repeats, reiterates and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set

forth herein.

163.  Plaintiff ROBERT ELLIS NILON was present as a participant in a peaceful protest march at the time of his arrest, in exercise of his First Amendment rights to free speech, expression and assembly.

164.  The Defendant POLICE OFFICERS, tackled, struck and arrested Plaintiff ROBERT ELLIS NILON in direct response to Plaintiff ROBERT ELLIS NILON's exercise of his First Amendment rights.

165.  Plaintiff ROBERT ELLIS NILON was not engaged in any illegal activity of any kind or sort when the Defendant POLICE OFFICERS tackled, struck and arrested him.

166.  The Defendant POLICE OFFICERS utilized excessive force against Plaintiff ROBERT ELLIS NILON in order to retaliate against him for lawfully exercising his First Amendment protected rights to free speech, expression, and association.

167.  The Defendant POLICE OFFICERS made false allegations against Plaintiff ROBERT ELLIS NILON and arrested him and subjected him to prosecution in order to retaliate against him for lawfully exercising his First Amendment protected rights to free speech, expression, and association.

168.  The actions of the Defendant POLICE OFFICERS heretofore described, were designed to and did cause bodily harm, pain and suffering in direct retaliation for Plaintiff ROBERT ELLIS NILON's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

169.  As a result of the foregoing, Plaintiff ROBERT ELLIS NILON is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

170.  As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT ELLIS NILON was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

171.  As a result of Defendants' impermissible conduct, Plaintiff ROBERT ELLIS NILON demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:      New York, New York
            September 18, 2014

Respectfully submitted,

_____~//s//~_____
SAMUEL B. COHEN [SC 0622]
STECKLOW COHEN & THOMPSON
217 Centre Street, Floor 6
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
SAM@WYLIELAW.COM
ATTORNEYS FOR PLAINTIFF